1228

C. RAY MILES CONSTRUCTION COMPANY, INC., Respondent v. R. E. WEAVER, d/b/a Weaver Land Clearing Company, Appellant.

(373 S. E. (2d) 905)

Court of Appeals

*John D. McLeod*, Winnsboro, *for appellant.*

*Dana A. Morris* of *Savage, Royall, Kinard, Sheheen & Byars*, Elgin, *for respondent.*

Submitted Sept. 15, 1988.

Decided Oct. 31, 1988.

SANDERS, Chief Judge:

Respondent C. Ray Miles Construction Company and appellant R. E. Weaver, d/b/a Weaver Land Clearing Company, entered into a contract by the terms of which the construction company leased certain earth moving equipment to Mr. Weaver. The construction company thereafter sued Mr. Weaver, alleging rent due under the lease and "damages to the leased earth-moving equipment." Mr. Weaver answered and counterclaimed against the construction company, alleging breach of both express and implied warranties "that the subject machine was reasonably fit for the purpose which the Plaintiff knew that it would be used for." The Circuit Court struck these allegations from the answer and counterclaim, on the grounds that the provisions of the Uniform Commercial Code pertaining to warranties apply only to contracts of sale and that "[t]he Court is not aware of any case permitting the creation of expressed

warranties or implied warranties in a strict lease situation." We reverse and remand.[1]

The section of the Uniform Commercial Code on express warranties is "limited in its scope and direct purpose to warranties made by the seller to the buyer as a part of a contract for sale." Section 36-2-313, Code of Laws of South Carolina, 1976, official comment. However, there is no reason why the parties should be prohibited from contracting for an express warranty on the personal property which was the subject of the lease. *See Huckaby v. Confederate Motor Speedway, Inc.*, 276 S. C. 629, 630, 281 S. E. (2d) 223, 224 (1981) ("[P]eople should be free to contract as they choose."); *Oxman v. Profitt*, 241 S. C. 28, 33, 126 S. E. (2d) 852, 854 (1962) ("Sound public policy requires enforcement of deliberately made contracts not clearly contravening positive law or rule of public morals."). Indeed, a holding that the parties to a lease cannot contract for an express warranty would represent a rather startling departure from these fundamental principles of law. A lessee of a car, for example, would doubtless be surprised to learn that the express warranty given by the lessor was unenforceable.

For these reasons, we conclude that the Circuit Court erred in striking the aspect of the pleading which alleged the breach of an express warranty.

The issue of whether the implied warranty alleged can arise under the circumstances is another matter.

At one time, many, if not most, common law jurisdictions did not recognize any implied warranty of quality and, where there was no express warranty and no fraud by the seller, applied the doctrine expressed in the maxim, *caveat emptor* ("let the buyer beware"). 67A Am. Jur. (2d) *Sales* § 701 (1985).[2] South Carolina, unique among all the states, rejected the common law maxim and, as early as 1793, recognized an implied warranty of soundness, based on the

---

[1] In fairness to the Circuit Court Judge, it does not appear that any of the authority cited in this opinion was called to his attention.

[2] *See* 55 C. J. *Sales* § 717 n. 99 (1931) ("It is a well-understood principle of the common law in England, and almost universal in this country, that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity or thing sold, and the seller is guilty of no fraud and is neither the manufacturer nor grower of the thing he sells, the maxim caveat emptor applies.").

civil law maxim, a sound price warrants a sound commodity. *See Timrod v. Shoolbred,* 1 S. C. L. (1 Bay) 324, 325-26 (1793) ("It has been decided, often, in our courts, that selling for a sound price, raises, in law, a warranty of the soundness of the thing sold."); *see also Barnard v. Yates,* 10 S. C. L. (1 Nott. & McC.) 142, 145 (1818) ("Our decisions, for a series of years, have been, and I trust for the honor and advantage of the state, will ever continue to be governed by the Civil Law maxim, 'that a sound price requires a sound commodity.' "); A. Biddle, *A Treatise on the Law of Warranties in the Sale of Chattels* 6-7, 255 (1884) (South Carolina is the only state where a warranty that an article is sound is implied from the fact that a sound price is paid).[3] Hence, the common law of South Carolina has developed differently from the common law of other jurisdictions, including England.[4]

The rule applied in this state has been stated variously. *E.g., Smith v. McCall,* 12 S. C. L. (1 McCord) 220, 220 (1821) ("a sound price implies a warranty of soundness of prop-

[3] In a day when court reporters were less restrained in their comments, Messrs. Nott and McCord effusively praised the judges who had recognized the civil law maxim in South Carolina. *See Barnard v. Yates,* 10 S. C. L. (1 Nott & McC.) 142, 152 (1818) (reporters' comment: "[W]e have not only the approbation of Judge Cooper, one of the most learned men of the present day, but also that of Kent, as able a chancellor as ever sat on a woolsack."). Judge Cooper, in his notes on Justinian, expressed joy at the good sense of the South Carolina bench in rejecting the English rule. *Id.* at 147. In the Middle Ages, the wool trade was the main source of commercial wealth in England, and tradition has it that the woolsack was introduced in the House of Lords to symbolize the importance of wool in the commerce of the realm. Royal officials attending Parliament were entitled to sit on a woolsack, and the Lord Chancellor, who enjoyed precedence over all peers except a prince royal, sat on the woolsack nearest the throne. In time, it became customary for the Lord Chancellor to sit on the woolsack when he delivered judgment in the Court of Chancery. He was referred to as "the noble Lord on the woolsack" to distinguish him from the common law judges who sat on a bench and were referred to as "the justices of the bench." *See* T. Plucknett, *A Concise History of the Common Law* 66-67 (5th ed. 1956); 1 J. Campbell, *Lives of the Lord Chancellors* 15-16 (7th ed. 1885). Of course, the reference to Chancellor Kent sitting on a woolsack is figurative.

[4] Justice Nott, writing for the Court in 1821, states the view that, since the law in England was not settled until the middle of the American Revolution, the Court, at the time *Timrod* was decided, might not have realized it was rejecting the English rule. *See Smith v. McCall,* 12 S. C. L. (1 McCord) 220, 222 (1821) ("[W]hile the Judges in England were sifting it on one side of the Atlantic, the Judges in South Carolina were sifting it on the other, and that they came to different conclusions on the same question."); *Missroon v. Waldo,* 11 S. C. L. (2 Nott & McC.) 76 (1819) (reporters' comment discussing the view of Justice Nott). Nevertheless, the intention of the

erty"); *Lester v. Graham*, 8 S. C. L. (1 Mill) 182, 182 (1817) ("[S]elling for a sound price, has been regarded as raising an .implied warranty on the part of the seller, that the thing sold was free from all defects. . . ."). The rule has also been stated alternatively. *E.g., Southern Iron & Equip. Co. v. Bamberg, E. & W. Ry. Co.*, 151 S. C. 506, 525, 149 S. E. 271, 278 (1929) ("[T]he rule of 'caveat emptor' is not applicable in this state, but rather the rule 'caveat venditor' obtains.").

The general, bare-bones language of the warranty of soundness was fleshed out with more specific language. *E.g., id.* ("Selling for a sound price raises an implied warranty that the thing sold is free from defects, known and unknown."). This warranty has been identified as the common law precursor to the implied warranty of merchantability provided by the Uniform Commercial Code. Section 36-2-314 South Carolina reporter's comments.[5]

By the early twentieth century, a second type of implied warranty had evolved, distinct from the warranty of sound-

---

Court to embrace the civil law maxim is clear. Justice Gantt, writing for the Court just after the War of 1812, did not pass up the opportunity to take a swipe at "the Mother Country": "In England, a buyer must indeed, for his own security, be upon the alert, and wonderfully dexterous and circumspect in detecting the thousand little tricks and villainies which the crafty and designing are capable of practising on the unsuspecting and unwary, else he can meet with no redress. To such a state of things, they may well have for their maxim, 'caveat emptor.' On our part, we have exchanged it for that of caveat venditor, and in behalf of honesty and fair dealing, I would say, esto perpetua [let it be forever]." *Barnard*, 10 S. C. L. (1 Nott & McC.) at 147.

Justice Richardson, writing for the Court in *Missroon*, appears to embrace the civil law maxim for purely pragmatic reasons. This case involved a shipment of twelve barrels of bread to Havana. There was testimony that the barrels contained new bread at both ends, "but in the middle, the bread was old, musty, and not fit for hogs to eat." 11 S. C. L. (2 Nott & McC.) at 77. The Court ordered Judgment for the buyers, observing "[i]f such shipments to the Havana were so encouraged, the Spaniards might well repay us in the like coin, and transmit us tobacco stems for best segars, or clay within their white sugar." *Id.* at 78.

*See* South Carolina reporter's comments on the warranty sections of the Uniform Commercial Code, Sections 36-2-312 through 2-318, Code of Laws of South Carolina, 1976 (discussing the historical development of the law of warranty in this state).

[5] *See* South Carolina reporter's comments on the warranty sections of the Uniform Commercial Code, Sections 36-2-312 through 2-318 ("The following Commercial Code sections make no drastic changes in the law of warranties."); Comment, *Commercial Transactions—Warranties—Implied Warranties of Quality Under the Uniform Commercial Code*, 20 S. C. L. Rev. 323, 332 (1968) ("The result in implied warranty cases should continue to be the same under the new Code as it was under South Carolina case law.").

ness but bearing traces of its language. *E.g., Walker, Evans & Cogswell Co. v. Ayer,* 80 S. C. 292, 61 S. E. 557 (1908); *Liquid Carbonic Co. v. Coclin,* 161 S. C. 40, 159 S. E. 461 (1931).

In *Walker,* the seller sold the buyer a typesetting machine which turned out to be "wholly unsuited for the purpose for which it was delivered to the defendant and wholly worthless." 80 S. C. at 295, 61 S. E. at 558. The Court affirmed judgment for the buyer, holding "[t]he rule in this state is that the seller, without any express warranty or representation of value, is held to warrant the article sold to be of value for the purpose to which it is ordinarily applied." *Id.* at 297, 61 S. E. at 559.

In *Liquid Carbonic,* the seller sold the buyer a soda fountain, knowing the buyer bought it to keep "ice cream hard and to serve the public and to keep water cold." 161 S. C. at 45, 159 S. E. at 463. The soda fountain "would not work properly." *Id.* at 43, 159 S. E. at 463. The seller sought to show that the machine was almost perfect, at least ninety-six percent efficient. The Court affirmed judgment for the buyer, holding "the law will imply a warranty that the article sold is fit and suitable for the purpose for which it is bought and for which a sound price is paid." *Id.* at 45, 159 S. E. at 463.

The newly evolved warranty was later more precisely phrased. *See Reliance Varnish Co. v. Mullins Lumber Co.,* 213 S. C. 84, 97, 48 S. E. (2d) 653, 659 (1948) ("There was an implied warranty that the materials sold were reasonably adapted to the purpose for which they were, with the knowledge of respondent, purchased by appellant."). This warranty has been identified as the common law precursor to the implied warranty of fitness for a particular purpose provided by the Uniform Commercial Code. Section 36-2-315 South Carolina reporter's comments.[6]

The exact relationship between the two implied warranties is somewhat difficult to ascertain. Yet, it is apparent that the fundamental elements of each may coexist. *E.g., Barnard,* 10 S. C. L. (1 Nott & McC.) 142; *Southern Iron,* 151 S. C. 506, 149 S. E. 271.

---

[6] *Id.*

In *Barnard*, the seller sold the buyer what they both believed to be barrels of blubber oil, knowing the buyer intended to resell to tanners for treating leather. The barrels were later found to contain not blubber oil but blubber, or "gurry."[7] "No Tanner would buy...." 10 S. C. L. (1 Nott & McC.) at 149. After reciting this fact and reciting further that the intention of the buyer in making the purchase was understood by the seller, the Court affirmed judgment for the buyer. However, the Court based its decision on "the Civil Law maxim, 'that a sound price requires a sound commodity.'" *Id.* at 145.[8]

In *Southern Iron*, the seller sold the buyer a locomotive, knowing the buyer intended to use it in interstate commerce. The locomotive later failed to pass inspection by the Interstate Commerce Commission. The Court affirmed judgment for the buyer based on the fact that, "[h]owever valuable the locomotive might be for other purposes, if it was not in I.C.C. condition, it could not be used by the railway company for the purpose for which it was purchased, and was therefore worthless to it." 151 S. C. at 531, 149 S. E. at 280. However, the Court also based its decision on the maxim: "Sound price warrants a sound commodity." *Id.* at 517, 149 S. E. at 278.

In any event, it is clear that the implied warranty alleged in the instant case has long been recognized in South Carolina as a matter of common law. Although implied warranties were most often recognized in connection with contracts of sale, at least one case specifically recognizes such a warranty in connection with a lease of personal property. *See Colcock v. Goode*, 14 S. C. L. (3 McCord) 513, 516 (1826) ("[T]he doctrine of implied warranty arises as well from a contract of hire as on the sale...."). There is no logical

---

[7] *Barnard* came to be known as "the Gurry Case." *Missroon*, 11 S. C. L. (2 Nott & McC.) at 78. "Gurry" is "[t]he offal of fish, esp. the soil from cutting a whale." *Webster's New International Dictionary of the English Language* 963 (1923).

[8] The Court also quoted, with approval, the civil law principle that " 'since people buy a thing only for its use, if it chance to have any defect, which hinders this use or lessens it, the seller ought not to reap the advantage of an apparent value, which the thing sold seemed to have, and yet had it not.'" *Barnard*, 10 S. C. L. (1 Nott & McC.) at 151 (quoting the French legal scholar Jean Domat); *see* J. Domat, *The Civil Law in Its Natural Order* pt. 1, bk. 1, tit. 2, sec. 11, art 5 (W. Strahan trans. L. Cushing ed. 1850).

reason for any distinction between contracts of sale and leases insofar as the recognition of implied warranties is concerned.[9]

The construction company appears to argue that the Uniform Commercial Code somehow preempts the common law, and since the implied warranties provided by the Code apply only to sales, no implied warranty can arise in connection with a lease. This is an imaginative but fallacious argument. The Code, itself, expressly provides that the common law supplements the Code unless displaced by particular provisions. Section 36-1-103. The warranty provisions of the Code "are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined ... to sales contracts.... They may arise in other appropriate circumstances such as in the case of bailments for hire...." Section 36-2-313 official comment.[10]

For these reasons, we further conclude that the Circuit Court erred in striking the aspect of the pleading which alleged the breach of an implied warranty.

Accordingly, the order of the Circuit Court is reversed and the case is remanded for further proceedings consistent with this opinion.

---

[9] The implied warranty of fitness in connection with leased personal property has been stated as follows: "[T]he lessor of a chattel to be used by the lessee for a particular purpose known to the lessor impliedly warrants the reasonable suitability of the chattel for the lessee's known intended use of it." Annotation, *Warranties in Connection with Leasing or Hiring of Chattels*, 68 A. L. R. (2d) 850, 854 (1959). *See* 8 Am. Jur. (2d) *Bailments* § 157 (1980) ("[I]n the absence of an agreement to the contrary, the bailor of a chattel to be used by the bailee for a particular purpose known to the bailor impliedly warrants the reasonable suitability of the chattel for the bailee's known intended use of it."); J. Domat, *supra* note 9, at pt. 1, bk. 1, tit. 4, sec. 3, art. 1 ("The lessor is bound to procure the free use and enjoyment of the thing to the person to whom he lets it out; to deliver the thing to him in a condition to serve the use for which it is hired....").

[10] We recently held that the provisions of the Uniform Commercial Code on implied warranties only apply to sales. *See Henderson v. Gould, Inc.*, 288 S. C. 261, 267, 341 S. E. (2d) 806, 810 (Ct. App. 1986) ("Before an implied warranty can arise under the UCC, a sale must first occur."). In *Henderson*, unlike the instant case, no exception presented the issue of whether the appellant could assert an implied warranty of quality, separate and apart from the Uniform Commercial Code. "Appellate courts in this state, like well-behaved children, do not speak unless spoken to and do not answer questions they are not asked." *Gathings v. Robertson Brokerage*, 295 S. C. 112, 118, 367 S. E. (2d) 423, 427 (Ct. App. 1988).

Reversed and remanded.

GARDNER and GOOLSBY, JJ., concur.